IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 4, 2016


IN RE: TRISTAN B.


**Appeal from the Juvenile Court for Bradley County**
**No. J12480     Kurt Andrew Benson, Substitute Judge[1]**


_____


**No. E2015-01993-COA-R3-PT**
**FILED-MAY 2, 2016**

_____


Father appeals the trial court's determination that termination of his parental rights is in the child's best interest. The trial court found clear and convincing evidence to terminate Father's parental rights on grounds of abandonment by wanton disregard, persistent conditions, and substantial non-compliance with a permanency plan. The trial court thereafter determined that termination is in the child's best interest. Discerning no error, we affirm both the trial court's rulings regarding grounds and its determination that termination is in the child's best interest.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J.,W.S, delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, J., joined.

L. Ashley Gaither, Chattanooga, Tennessee, for the appellant, William B.

Herbert H. Slatery, III, Attorney General and Reporter; Eric A. Fuller, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

Berry Foster, Chattanooga, Tennessee, Guardian ad Litem.


**OPINION**

---

[1] The orders entered by the trial court indicate that Judge Benson is a juvenile magistrate sitting as substitute judge in this case.

# Background

On November 17, 2014, the Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court of Bradley County to terminate the parental rights of William B. ("Father") to his child, Tristan B. ("the child"), who was born in 2010.[2] The petition alleged the child was placed in DCS custody in October 2012 after a referral indicating that the child was exposed to drugs. According to the petition, the child was later adjudicated dependent and neglected and has remained in DCS custody continuously since his removal. The petition further alleged that Father was currently incarcerated in Tennessee after a pattern of criminal activity. DCS sought termination of Father's parental rights on grounds of wanton disregard, substantial noncompliance with a permanency plan, and persistent conditions. The petition finally alleged that termination was in the child's best interest.[3]

The trial court conducted a hearing on DCS's petition to terminate Father's rights on September 10, 2015. Makia Hendrix, a supervisor for DCS testified first regarding the circumstances that led DCS to intervene in this case. According to Ms. Hendrix, on September 27, 2012, DCS received a referral that Father was under the influence of drugs around the child. When a school official allegedly attempted to detain Father as he was dropping the child's older siblings[4] at school, Father "sped off in the school zone." After the child was taken into custody, DCS also discovered that Father had at least one outstanding warrant, one of which related to Father's use of methamphetamines. DCS later learned that Father was incarcerated, but Ms. Hendrix was unable to recall if his incarceration stemmed from the outstanding warrant or new charges. Ms. Hendrix testified that Father failed to cooperate in any way with DCS's investigation regarding the child.

Father testified that he is currently incarcerated in state prison, where he had resided for the previous three years, or since November 2012. Father testified that the child has been in DCS custody since he was two years old and that he had remained in DCS custody for approximately three years. Father testified that he has had no visitation with the child in the three years that the child has been in DCS custody. DCS entered certified records showing that in 2007 Father pleaded guilty to charges of evading arrest, unlawful drug paraphernalia, violation of vehicle registration, possession of methamphetamine for resale, and violation of the financial responsibility law. Father was

---

[2] In cases involving termination of parental rights, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[3] According to the briefs in this case, the child's mother's parental rights were terminated in a separate proceeding. Only the termination of Father's parental rights are at issue in this appeal.

[4] Father is not the biological parent of the child's siblings. Accordingly, the child's siblings are not at issue in this appeal.

sentenced to a total term of eight years, with six months served in jail and the remainder on probation. Father admitted, however, that he was found to have violated his probation three times after his release from prison. These violations resulted from Father's failure to pay fines and fees, Father incurring additional charges,[5] and Father twice testing positive for methamphetamines. Father testified that he was required to attend drug rehabilitation in May 2010. In April 2012, however, Father once again tested positive for methamphetamines. Father testified that he was then placed on bond, the terms of which he soon violated. Father later admitted that he was arrested again in November 2012 and pleaded guilty to charges of automobile burglary, two counts of theft, and simple possession of an illegal drug. Father was sentenced to a total sentence of two years on these charges in February 2013. As a result of these various violations, Father was eventually ordered to serve the remainder of his eight year term. Father testified that his sentence would terminate in December 2018. According to Father, however, he had already been approved for parole and was scheduled for release on January 18, 2016, shortly after he completes a program. Father admitted that he had no documentation to support his testimony regarding his parole.

Father testified that he was aware of the permanency plan and its goals and requirements. With regard to his requirements under the plan, Father testified that they all involved "[a] bunch of stuff that you can't do while you're locked up." Father admitted, however, that he could participate in a drug and alcohol assessment while in prison, but that he refused to participate in the assessment initially because he believed it would add time to his sentence. Father testified that he was currently participating in an alcohol and drug treatment program and that he was employed in prison. Father admitted he had no documentation to support his testimony on this issue. Father testified that he had not completed a parenting assessment. Father testified that this period of time represents the longest period of time he has been drug-free since he started using drugs. Father further testified that when he is released from prison he has a job waiting on him and he plans to live with his grandparents.

Father denied that he was the person who sped away from the school on or around the day that the child was taken into DCS custody. In fact, Father admitted that after his most recent drug test failure, sometime shortly after April 2012, Father had little to no contact with his child.[6] Instead, Father suggested that that another man was with the child's mother that day. Indeed, at the beginning of the termination proceedings, Father questioned whether he was the biological parent of the child.

Father's testimony on his involvement with the child prior to his incarceration was somewhat conflicting. On the one hand, Father testified that even when he was not

---

[5] Father testified that these charges were eventually dismissed.

[6] Father first testified that he had no contact with the child after this time. Father then testified that he saw the child "a few" times, but could not recall the length of the meetings, specifically whether they lasted for ten minutes or one hour.

incarcerated during the child's life, he did not live with the child or have custody of the child. Indeed, Father was unable to testify as to the child's birth date. Father insisted, however, that he "took care of everybody" during the periods he was not incarcerated, that he bought "diapers and stuff" for the child, and that he was around the child every day during this time. According to Father, this period lasted for the first year and a half of the child's life until he relapsed into drug use. Once Father failed a drug test in April 2012, however, he testified that he was largely absent from the child's life; Father even admitted that "you can't be a father and be on the run from the police." Father testified that even when he was not incarcerated, he did not have a residence for the child to live in; instead Father moved "from friends to friends." Father testified that it would take some time before he would be able to parent the child after he is released from prison.

Deborah Kennedy, a case manager with DCS, testified regarding the permanency plans created for the benefit of the child. According to Ms. Kennedy, three permanency plans were created for the child that contained specific requirements for Father to complete, discussed in detail *infra*. The first two plans were ratified by the trial court. Father signed an acknowledgment of his responsibilities under the first plan. Father did not sign the second plan, but Ms. Kennedy testified that a copy was mailed to Father in prison. According to Ms. Kennedy, Father was required to complete the same tasks under both plans, including *inter alia*, participating in a drug and alcohol assessment and treatment and providing proof to DCS of his participation, signing releases for DCS to obtain documents, and submitting to random drug screenings and remaining drug-free.

Ms. Kennedy testified that she made several attempts to contact Father in an effort to help him comply with the permanency plans. Specifically, Ms. Kennedy sent letters to Father informing him that she was the child's caseworker and asking Father to contact her. In August 2014, Ms. Kennedy wrote to Father informing him of the services that he could participate in at his prison, including alcohol and drug classes, GED classes, career classes, landscaping classes, and culinary arts classes. In the letter, Ms. Kennedy specifically asked that Father complete the alcohol and drug classes to comply with the permanency plan. The letter also indicated that although Father was allowed to take employment, he had not done so at that time. Ms. Kennedy informed Father that DCS "would like for you to get a job while you're in there to show you are able to maintain employment." After this letter was sent, Ms. Kennedy testified that Father contacted her on September 15, 2014 stating that he was to be released from prison in seven months on parole and that he would like a DNA test performed on the child. According to Ms. Kennedy, Father informed her that he would not take any classes or obtain employment in prison at that time because "it would make him have to stay in there longer." Ms. Kennedy testified that she never received any documentation regarding Father's alleged release at that time. Ms. Kennedy also testified to a face-to-face meeting with Father in January 2015, when Father again alleged that he was to be released "within a month or two." At this meeting, Father did not inform Ms. Kennedy of any programs in which he was participating, nor did he offer any documentation regarding programs or classes. Ms.

- 4 -

Kennedy testified that in March 2015, after the termination petition had been filed, Father informed her that was participating in a program because he could not be released from prison until he completed the program. At this time, Father also informed her that he had obtained a job in prison. Ms. Kennedy testified, however, that she never received any documentation regarding the program or Father's alleged January 2016 release date.

Ms. Kennedy finally testified that the child is in a pre-adoptive home, where he has been residing since coming into custody. According to Ms. Kennedy, the child refers to his foster parents as "mom" and "poppa." Ms. Kennedy described foster parents as a "wholesome" and stable family and stated that it would be traumatic to remove the child from their care at this point. Ms. Kennedy testified that the child has no bond with Father. Ms. Kennedy stated that if Father's parental rights were not terminated, the child would linger in foster care for much longer.

On September 29, 2015, the trial court entered an order finding that DCS proved by clear and convincing evidence that Father's parental rights should be terminated on grounds of wanton disregard, substantial noncompliance with the permanency plan, and persistent conditions. Finally, the trial court found that it was in the child's best interest that Father's parental rights be terminated. To support this determination, the trial court found that Father had not made appropriate changes in his life that would make it safe for the child to return and that Father's continued incarceration prevents a meaningful relationship with the child.

## Issues Presented

Father raises only one issue in this appeal: Whether the trial court erred in finding that termination of Father's parental rights is in the child's best interest. Recently, however, in *In re Carrington H.*, --- S.W.3d ---, 2016 WL 819593 (Tenn. Jan. 29, 2016), the Tennessee Supreme Court held that in order to protect the due process rights of parents facing termination of their parental rights, "the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *Carrington*, 2016 WL 819593, at *13 (footnote omitted) (citing *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010)). Accordingly, in addition to the issue specifically raised and briefed by Father, we will also consider whether the trial court erred in finding clear and convincing evidence regarding each ground for termination.

## Discussion

As recently explained by the Tennessee Supreme Court:
> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the

federal and state constitutions. ***Troxel v. Granville***, 530 U.S. 57, 65 (2000); ***Stanley v. Illinois***, 405 U.S. 645, 651 (1972); ***In re Angela E.***, 303 S.W.3d 240, 250 (Tenn. 2010); ***In re Adoption of Female Child***, 896 S.W.2d 546, 547–48 (Tenn. 1995); ***Hawk v. Hawk***, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. ***In re Angela E.***, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." ***Hawk***, 855 S.W.2d at 580 (quoting ***In re Hamilton***, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also **Santosky v. Kramer***, 455 U.S. 745, 747 (1982); ***In re Angela E.***, 303 S.W.3d at 250.

***In re Carrington H.***, No. M2014-00453-SC-R11-PT, --- S.W.3d ---, 2016 WL 819593, at *10 (Tenn. Jan. 29, 2016) (footnote omitted).

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." ***In re Jacobe M.J.***, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting ***In re W.B.***, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); ***In re D.L.B.***, 118 S.W.3d 360, 367 (Tenn. 2003); ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. ***Santosky***, 455 U.S. at 769. Consequently, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); ***In re Valentine***, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." ***In re M.J.B.***, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." ***Id***. at 653.

The Supreme Court has opined that it is our duty "to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." ***In re F.R.R., III***, 193 S.W.3d 528, 530 (Tenn. 2006).

We evaluate the evidence in this case with this standard in mind.

When the resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp.***, 910 S.W.2d 412, 415 (Tenn. 1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

In this case, DCS alleged three grounds to support termination of Father's parental rights: (1) abandonment through wanton disregard pursuant to Tennessee Code Annotated Sections 36-1-113(g)(1) and 36-1-102(1)(A)(iv); (2) persistent conditions pursuant to Tennessee Code Annotated Sections 36-1-113(g)(3); and (3) substantial noncompliance with a permanency plan pursuant to Tennessee Code Annotated Sections 36-1-113(g)(2). We begin with the ground of abandonment through wanton disregard.

## Abandonment by Wanton Disregard

Section 36-1-113(g)(1) provides that one ground for termination of parental rights is "[a]bandonment by the parent or guardian, as defined in § 36-1-102." In turn, Tennessee Code Annotated Section 36-1-102(1)(A)(iv) defines "abandonment," in relevant part, as:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; . . . .

Although Tennessee Code Annotated Section 36-1-102(1)(A)(iv) does not specifically define "wanton disregard," Tennessee courts have held that a parent's drug abuse and criminal activity can constitute a wanton disregard for the welfare of the child. ***In re Audrey S.***, 182 S.W.3d 838, 867–68 (Tenn. Ct. App. 2005); *see also **In re H.A.L.***, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *6 (Tenn. Ct. App. Apr. 25, 2005).

Here, there can be no dispute that Father was incarcerated at the time that DCS filed its petition to terminate parental rights and for the entire four months preceding such filing. Father also admitted that he has had little to no visitation with the child since the spring of 2012. Furthermore, the trial court specifically found that:

> 35. [Father] repeatedly incurred criminal charges and has repeatedly violated the terms of his probation. [Father] is currently serving a sentence that may not end until December 29, 2018.
>
> 36. Because of the [Father's] repeated and continued incarceration, he has been unable to maintain contact with the child and has not maintained his bond with the child. Further, because of his incarceration, he is unable to provide a home for the child, and is therefore causing the child to linger in foster care.

From our review of the record, we agree that clear and convincing evidence supports the trial court's finding of abandonment by wanton disregard. The record on appeal fully supports the trial court's finding that Father incurred repeated criminal charges throughout the child's short life. Indeed, it appears that Father pleaded guilty to nine separate criminal charges from 2007 to 2012, in addition to thrice violating his probation and at least once violating the conditions on his bond. Of Father's criminal charges and violations, at least six occurred after the birth of the child, including Father's April 2012 drug test indicating that Father was abusing methamphetamines. Father even admitted that his criminal activity prevented him from being a proper parent for child, as he spent his time evading arrest rather than parenting. Father further admitted that he was aware of the conditions of his probation, but nevertheless knowingly engaged in conduct that required him to return to jail. Furthermore, Father tested positive for methamphetamines in 2012, despite having attended drug rehabilitation years earlier. Indeed, Father testified that his current time incarcerated is his longest drug-free period since he began using drugs. Clearly, these facts support a finding that Father's pre-incarceration criminal activity and drug use constitute wanton disregard for the welfare of his child.

### Persistent Conditions

Persistence of conditions requires the trial court to find, by clear and convincing evidence, that:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at any early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 461675, at *20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

With regard to this ground, the trial court found:

42. The child has been removed from the parent's home by court order for more than six months.

43. The conditions that led to the removal still persist and other conditions [] exist that likely would lead to further neglect or abuse of the child. At the time that the child entered custody, the [Father] was running from law enforcement as he had outstanding warrants for his arrest. Since the child was placed into foster care, [Father] continued to incur additional criminal charges. [Father] continues to be incarcerated based upon his revocation of his probation and because he plead[ed] guilty to new charges. [Father] testified that he expects to be released on parole during February 2016[;] however he acknowledged that he has previously, on more than one occasion, expected to be granted parole and released and was denied release by the parole board.

44. There is little chance that those conditions will be remedied soon so that the child can be returned safely to the home. If he is granted parole during February 2016, he would require an extensive period of time to establish and demonstrate stability and sobriety in an uncontrolled environment. It would not be safe or possible for this child to return to [Father] custody at any date in the near future.

45. Continuation of this parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

From our review of the record, we agree that clear and convincing evidence supports the ground of persistent conditions. Again, there is no dispute that the child has been removed from Father's custody for longer than six months due to Father's criminal activity and drug use. Father continued to incur criminal charges even months after the child was removed from his custody. Because of these charges, Father has been removed from the child's life for longer than he was a part of it. Furthermore, Father's sentence is not scheduled to terminate until January 2018. Although Father testified that he was to be released on parole, when questioned by DCS, he conceded that he could provide no documentation to support this claim. Furthermore, Father's testimony on this issue is far from credible, as he had falsely claimed multiple times before that he was to be released early. Even if Father were to be granted parole, we agree with the trial court that more time would be required in order for him to "demonstrate stability and sobriety in an uncontrolled environment." Finally, testimony shows that the child is in a home that is willing to adopt him. Under these circumstances, we conclude that Father has not remedied the conditions which led to the child's removal in a sufficient manner to allow the child to return to Father at an early date and continuing the relationship "greatly

diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3).

## Substantial Noncompliance with Permanency Plan

Finally, the trial court also terminated Father's parental rights due to noncompliance with a permanency plan. Tennessee Code Annotated Section 36-1-113(g)(3) provides that one ground for termination may be that: "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" As discussed by this Court in *In re M.J.B.,* 140 S.W.3d 643 (Tenn. Ct. App. 2004):

> Terminating parental rights based on Tenn. Code Ann. § 36-1-113(g)(2) requires more proof than that a parent has not complied with every jot and tittle of the permanency plan. To succeed under Tenn. Code Ann. § 36-1-113(g)(2), the Department must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place, *In re Valentine,* 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003), and second that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.,* 2003 WL 21266854, at *12. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance. *In re Valentine,* 79 S.W.3d at 548; *Department of Children's Servs. v. C.L.,* No. M2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App. Aug. 29, 2003) (No Tenn. R. App. P. 11 application filed).

*In re M.J.B.,* 140 S.W.3d at 656–57.

With regard to this ground, the trial court found:

> 38. After the child came into state custody, on December 13, 2012 and A[ugust] 21, 2014 [DCS] developed permanency plans for the child which listed a number of requirements that the [Father] needed to satisfy before the child could safely be returned home.

- 11 -

> 39. This Court ratified the permanency plans as in the child's best interests and found that the requirements for the [Father] were reasonably related to the reason for foster care.

> 41. The [Father] has not substantially complied with his responsibilities under these permanency plans, as he has failed to take advantage of any of the classes offered to him for at least the first two years and four months after he was incarcerated and because the [Father] is unable to provide a safe and stable home for his child, due to his incarceration.

The record on appeal contains two permanency plans ratified by the trial court. The first plan was created by DCS on December 13, 2012. Father signed an acknowledgment of his responsibilities under the plan on February 14, 2013, and the plan was ratified by the trial court on April 25, 2013. The plan contained a clear statement of responsibilities requiring Father to, *inter alia*: (1) complete an alcohol and drug assessment and follow recommendations; (2) participate in and successfully complete alcohol and drug treatment program; (3) sign releases allowing DCS to obtain records; (4) submit to random drug screenings and pill counts; (5) refrain from misusing, abusing, or selling prescription medication; (6) take all medication as prescribed; (7) provide a safe home for the child and refrain from being under the influence of substances in the presence of the child; and (8) obtain housing, seek suitable employment, and provide DCS proof of reliable and legal income. Although the second plan contained in the record is not signed by Father, it does appear that it was sent to Father in prison. The second plan was ratified by the trial court on August 21, 2014 and contains largely similar requirements with regard to Father.

From the record, it appears that Father made no genuine effort to comply with the relevant parenting plans. Here, Father began his current incarceration in November 2012. Although Ms. Kennedy testified that Father was made aware of classes and employment opportunities that would satisfy the requirements of the permanency plan, Father voluntarily chose not to participate in those services because he believed it would lengthen his sentence. Furthermore, while Father testified that he eventually obtained employment and participated in a program offered by the prison, he did so months after the termination proceeding was filed and, apparently, only in an effort to reduce his sentence. Furthermore, the testimony at trial was undisputed that Father never provided any documentation to DCS regarding his participation. We have held in similar circumstances that such effort is simply "too little, too late." *See In re Emily N.I.*, No. E2011-01439-COA-R3-PT, 2012 WL 1940810, at *16 (Tenn. Ct. App. May 30, 2012) ("We believe that the Parents' refusal to complete a number of the requirements until after the termination petition was filed . . . was simply '[t]oo little, too late'" given the length of time the child had been removed from the parents' custody.) (quoting *In re A.W.*, 114 S.W.3d 541, 546–47 (Tenn. Ct. App. 2003) (indicating that mother's efforts

after the filing of the termination petition constituted improvement, but ultimately holding that such improvement was "[t]oo little, too late")); *see also In re Jada T.L.P.*, No. E2011-00291-COA-R3-PT, 2011 WL 3654486, at *6 (Tenn. Ct. App. Aug. 19, 2011) (holding that mother's submission to drug tests after the filing of the termination petition was "too little, too late"). We thus affirm the trial court's judgment terminating Father's parental rights on the ground of substantial noncompliance.

**Best Interest**

When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. **White v. Moody**, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. **In re Audrey S.**, 182 S.W.3d at 877. The focus shifts to the child's best interest. **Id**. Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. **Id**. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." **Moody**, 171 S.W.3d at 194.

The Tennessee General Assembly has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. These factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

- 13 -

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).  This Court has noted that, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child."  *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877.  As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Audrey S.*, 182 S .W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

The trial court found that it was in the child's best interest that Father's rights be terminated because Father had not "made changes in his conduct or circumstances that would make it safe for the child to go home" and had "not maintained regular visitation with the child." The trial court further found that termination was appropriate because there was no meaningful relationship between Father and the child and removing the child from his foster parents would have a detrimental effect on the child.

Having thoroughly reviewed the record, we must agree with the trial court that termination of Father's parental rights is in the child's best interests. Because of Father's repeated criminal conduct and drug use even after the birth of the child, Father has had no meaningful contact with the child since he was approximately eighteen months old. Indeed, the child has been in his foster parents' home longer than he was with Father. At this point, Father and the child have no meaningful relationship and the child views foster parents as his family. Removing the child from his foster parents and placing him into the instability that Father's life may entail after his eventual release from prison is clearly not in the child's best interest. Indeed, even Father's belated efforts to comply with the permanency plan in this case illustrate the fact that Father only has his own best interests at heart. In fact, Ms. Kennedy testified without dispute that Father first refused to participate in classes at prison because he believed it would lengthen his sentence, despite the fact that such classes were required to prevent termination of Father's parental rights and facilitate the eventual return of the child to his custody. Father only began participating upon learning that participation was required before he could be released on parole. As such, it appears that throughout his time in prison, Father has considered only himself, rather than the welfare of his child. Under these circumstances, we agree with the trial court that termination of Father's parental rights was in the child's best interest.

## Conclusion

The judgment of the Juvenile Court of Bradley County is affirmed and this cause is remanded to the trial court for all further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellant William B. Because Appellant is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
J. STEVEN STAFFORD, JUDGE